All right, we will hear argument next in number 23-2235, National Association of Immigration Judges v. Neal. And Ms. Krishnan, when you're ready. Good morning and thank you, Your Honors. May it please the Court, my name is Ramya Krishnan and I appear for Appellant National Association of Immigration Judges. I reserve three minutes for rebuttal. This case is about a sweeping prior restraint on the speech of federal immigration judges. Under the challenge policy, judges are categorically banned from speaking as private citizens about immigration law and policy issues that they are uniquely positioned to address. This ban inflicts what the Supreme Court in Axon Enterprise called a here and now injury. But the government argues that to obtain relief, judges must mire themselves in an administrative process that might never lead to federal court or else deliberately violate the policy and risk being fired. This is not and cannot be the law. The government has made three main arguments, each revolving in some way around the first and most important Thunder Basin factor, which asks whether withdrawing district court jurisdiction could foreclose meaningful judicial review of the plaintiff's claims. First, the government argues that the Civil Service Reform Act, which I'll call CISRA for short, provides meaningful judicial review of NAJ's claims because the association can raise those claims through the statutory scheme. But this is incorrect. NAJ can't obtain any judicial review through the scheme because it does not challenge a covered employment action. To start, none of the association's members face removal or any other adverse action covered by the scheme, and all of its members intend to comply with the policy. This means that none of its members can avail themselves of Chapter 75's review procedures, and they would fare no better under Chapter 23, which allows federal employees to challenge prohibited personnel practices. The government argues that NAJ can challenge the policy as a prohibited personnel practice because it imposes a significant change in working conditions. But accepting this argument would require reading that phrase in isolation rather than as part of a whole, which the Supreme Court has instructed courts not to do. As the Fifth Circuit's recent en banc decision in Feds for Medical Freedom recognized, reading the phrase change in working conditions in context, it is clear that it refers to routine employment actions against individual employees. Decisions like the decision to promote an employee or reassign an employee, it doesn't encompass broad prior restraints of the kind at issue here. This interpretation makes sense of the CISRA structure, which treats prohibited personnel practices as less severe than adverse actions and therefore worthy of less process. It's also consistent with a long line of cases which have allowed federal employees to challenge speech policies directly in court so long as they are not targeting a covered sanction for non-compliance. But are these the cases that either predate Elgin, which some of them do, or are these, yeah, are these, are the cases you're talking about cases that either predate Elgin or literally don't consider the very question we're here to decide? The cases do precede Elgin, but Elgin in our view breaks no new ground. Really? Wow. When I read Elgin, I thought, wow, this breaks a lot of new ground. Well, Elgin, I think what mattered in Elgin was that although the plaintiff employees styled their constitutional claims as a facial and as applied challenge, what they were really challenging in that case was their termination, which is a covered adverse action under the CISRA. And so the court held that, you know, employees can't circumvent the CISRA by essentially, you know, engaging in artful pleading, but that's not what's happening here. What, what plaintiffs bring is a simple pre-enforcement challenge that stands independently of any covered sanction for non-compliance. I guess I'll say, I read Elgin as standing for two high level propositions. There's no facial challenge exceptionalism. So I think there's no pre-enforcement facial challenge exceptionalism exception to the CISRA. And I also read Elgin as saying, there's no constitutional exceptionalism exception to CISRA. I think Elgin to me pretty clearly establishes both. There's not constitutional exceptionalism and there's not facial challenge exceptionalism. And I put those two things together and they seem kind of bad because a lot of your arguments start to sound like either first amendment exceptionalism or pre-enforcement exceptionalism. Why am I wrong about that? So I think your honor is correct that Elgin says that it is not decisive whether you bring a facial or constitutional challenge. What matters is whether the employee is a covered employee and whether they challenge a covered employment action. And the policy that we challenge here is not a covered employment action like the adverse actions that the employees in Elgin had already suffered. But I would also point to the Supreme Court's most recent guidance in acts on enterprise, which clarifies what meaningful judicial review entails. And what that case makes clear is that where the plaintiff is suffering, what the court there calls a here and now injury, where they are suffering the kind of harm that cannot be remedied by post deprivation judicial review, that they are entitled to immediate judicial review. And that's the kind of injury that NAJ has been. So I'm glad you brought up Axon because I, again, I will fully confess that until, sort of until I read Axon, I'm reading all the cases before Axon and candidly, none of them make any sense to me at all. But then I get to Axon and Axon's like this really helpful opinion. It basically says the basic question, we need to like step away from these, like in the weeds stuff. And we take a step back and like there's Thunder Basin where we say you got to go through the CSRA and then there's free enterprise, which says you don't have to go through the CSRA. So the question we're going to ask in Axon is, is this a case that's more like Thunder Basin or more like free enterprise? Right. And then the court gets a whole series of reasons why that case seems more like free enterprise. And the problem for me is that I grant your point about the here and now injury and I want to get to that, but possibly with the exception of the language about the here and now injury, every single thing the court says in Axon about why those folks don't have to go through the CSRA, I read it and I go like, and that's a reason why these plaintiffs do have to go through the CSRA. Like every single reason Justice Kagan's opinion for the court gives, other than the here and now injury, points me in the direction of saying CSRA. Why am I wrong about that? So I think this is, this case is actually worse than Axon because in that case the court recognized the plaintiffs had a guarantee of judicial review if they went through the statutory scheme, whereas here they don't. And when they talked about free enterprise, what they said mattered in that case was that although the accounting firm was mired in a board investigation, but not all board actions went to the commission and the statutory scheme there only provided for judicial review of commission orders. And so the court held in that case that there was no meaningful judicial review in part because the plaintiff firm then never obtained judicial review by going through the statutory scheme and that's what you have here. You have to acknowledge there's lots of language in Axon that does seem to apply here where the court's like, the reason these folks don't have to go through the system is they're challenging them. So like they're going to show up in front of the agency and they're going to say, I do not recognize the legitimacy of your authority. I shouldn't have to be here. I shouldn't have to be here. That's going to be their answer to every single thing the agency does. I shouldn't have to be here. I shouldn't have to be here. I shouldn't have to be here. There's no reason for us to talk about the merits because I shouldn't have to be here. And so like, what's the point of going to the agency if the thing the person's going to say over and over and over again is I shouldn't have to be here. That's not true here. And there's like experts. And also the agency is not an expert and whether the agency is unconstitutional, like that seems like this. But here, like there's a lot of questions in this case. I read the briefs and I was like, I don't really understand exactly how this policy works and what the details are and can we make it more reasonable? These all strike me as things that the agency would be exceptionally well-suited to do. Like what's the reason why we're trying to tell immigration judges they can't do this? And is there like, what's the reason for this restriction and how those questions strike me as in the heartland of what the agency is there for? So what Axon says about the expertise factor is that the question is really whether the constitutional questions that are raised are intertwined with or somehow embedded in issues in which the agency, the relevant agency is expert. And in that case, the court held that there were no relevant threshold questions that the constitutional questions that the agency there and you have the same thing here. I mean, the government hasn't identified a single threshold question on which the board is expert. And this is something that distinguishes, for example, the righty case. I just want to make sure I'm understanding kind of the schematic here. In Axon, they're looking for whether there are these sort of threshold questions as to which the agency might be expert because everyone is agreeing the agency obviously has no expertise on these separation of powers questions. But here I would think the agency does have expertise on kind of the merits, the underlying merits. Don't they see speech policies all the time and have to figure out whether those? I don't understand why the agency forget the sort of preliminary threshold questions. The agency would have expertise on the underlying question here. What is the point of this policy? Why is it a good idea? How should it be applied? So generally speaking, when the board has touched on First Amendment questions, they're always within the context of an individual employment action. I can see that the agency has relevant and special expertise where what it's confronting is an individual employment action. But there are a number of textual indicia in the CISRA which strongly point to the conclusion that what change in working conditions refers to is typical everyday employment actions that are taken against individual employees. I mean, to start with change in working conditions appears in a residual cause that comes at the end of a 12-item list defining personnel action. And the courts, when confronted with these kinds of residual causes, have generally turned to the principle of a just and generous and have treated, have interpreted the residual cause consistently with the preceding specifically enumerated actions. And all of the specifically enumerated actions in the personnel action definition are all individual employment actions. So that's not how I read 11, but maybe people could read that differently. But the district points to 11, I think, the implementation or enforcement of a nondisclosure policy. And that does sound like it's talking about a policy, and not only that, but a policy that bears on speech. Why is that not a problem for your argument? Well, conspicuously, that brominette refers to not a policy, but the implementation and enforcement of a nondisclosure policy. And I think that this language at the end of the definition of personnel action is also relevant with respect to an employee. And I think read in context, it's clear that implementation and enforcement of nondisclosure policy is meant to read consistent with the rest of the definition. And all of the other actions mentioned are individual employment actions. We should use just and generous for 11, too, basically. To understand what 11 means, we should also compare 11 to 1 through 10 and read it to mean only individual actions related to this nondisclosure policy. When I see implementation of a policy, that sounds to me like putting out a policy. I've implemented a new policy for my office, and this is it. I think if Congress had intended to refer to encompass nondisclosure policies or speech policies writ large, it could easily have said so. And it is notable that it did not. And this quote should give effect to Congress's intent there. I have just to close a loop point on 11, I think. So when you said it says the implementation or enforcement of any nondisclosure policy, does that mean that your argument suggests that if a person wanted to challenge the nondisclosure policy writ large, they can do that outside the CSRA? Like my agency just announces a nondisclosure. It's not how they implement it. You think you could bypass the CSRA then too? Where they haven't suffered a covered disciplinary sanction. And so the case would be distinguishable from Elgin in that respect, that it wouldn't be an attempt to use the proceeding to reverse what is a covered employment action. And this also makes sense of the structure. It does. I was just literally about to say to me that seems to make complete hash of the statutory structure because it turns out they're like, I'm hearing what you're saying. There are a million ways around this for anyone who wants to challenge any policy. You just repackage your claim as, I'm not challenging the thing that happened to me. I'm challenging the policy. It also seems to me that it reaches the opposite result of what you would want. That the person who's actually suffered injury gets, as you put it, mired in this agency review process. But the person who's actually not suffered an injury and just has a hypothetical claim, takes their claim to federal court. So it seems to turn the whole system on its head where you have the more injured employee in this more arcane process, as you called it. Or the person who is just bringing this hypothetical claim with no injury gets to come to federal court. So how does that work? I think for the mine run of employment policies, and then this is something that Judge Howell recognized in the Turner decision, that an employee is going to be unable to point to an injury distinct from a covered sanction for non-compliance that stands independently of the policy that they're challenging. Whereas here, what NAAJ challenges is a policy, the very existence of which causes a here and now injury, because it chills speech whether or not NAAJ's members are ever disciplined for not complying with the policy. And you simply won't have that with most employment policies. What, because they, well, but I presume most policies are, in fact, designed to chill things. If I have a policy that says you have to come to work by 9 a.m., that is designed to chill people from coming to work after 9 a.m. The point of policies is to deter things that are prohibited by the policy. That's what the point of policy is, right? But I think what distinguishes the chilling effect here is that we're talking about speech. And the Supreme Court and this court have made very clear in many, many cases that where a person is suffering even a temporary loss of their First Amendment rights in the face of a prior restraint, that that is irreparable harm. So, okay, so that is at least a principle. So this doesn't apply to everything. It doesn't even apply to constitutional claims generally, because this chill thing that you're talking about, we don't do this for most constitutional rights, right? Like if I believe there's a policy that violates the Equal Protection Clause or violates the Fourth Amendment or violates the Second Amendment, this chill theory that you're advocating doesn't work, right? That's correct. Like, I don't know, a policy that says no firearms in my building. You couldn't bring up, are you, is embracing your position saying a person who watches to challenge the no bringing a gun to work can bring a pre-enforcement challenge against the no guns to work policy? No, not at all. Because of the First Amendment exceptionalism? But how would that be a personnel action in your view? How would me just saying no one brings a firearm into my office, how is that a personnel action in your view? Or someone would have to bring a firearm and then get fired and then I'd make a challenge through this, is that the idea? I think that when you're talking about a non-speech policy, generally speaking, you only have a covered action where an employee suffers a covered disciplinary sanction. But an employee still, if they want to get into federal court, is going to have to satisfy Article III standing and ripeness requirements. And in most cases- I would bring a firearm to work, but for this policy that forbids me from bringing a firearm. And they attach a declaration and there's no reason to question them that they would in fact do it. Don't they have Article III standing at that point? Article III standing if they- If they execute a declaration that said, my boss has a rule that no one can bring a firearm into the office. If my boss did not have such a rule, I would bring a firearm to the office, as demonstrated if you want to really make standing belt and suspenders. In previous jobs where I was allowed to bring firearms to the office, I did in fact bring firearms to the office. So there's no reason to doubt my sincerity when saying that I would do it. That person has Article III standing. So the reason, if that claim loses, it's not because they lack Article III standing, right? Can I have a moment to answer your Honor's question? I mean, this court's case in Wrighty suggests, for example, that where an employee, even short of having suffered termination, faces a covered adverse action, it may be that they're able to bring a pre-enforcement challenge through the CSRS review procedures. But I do think this ultimately comes down- I just want to- Is that how you read the CSRA? That someone who faces in the future, the possibility of a Chapter 75 adverse action can bring a pre-enforcement challenge through Chapter 75? Because I feel like that would resolve all of your problems. No. I mean, I think the adverse action would have to be proposed within the meaning of the statute. And in that case, the court thought that termination had been proposed because the employees had not only violated the policy, but, quote, enforcement had already begun. And we don't have facts of that nature in this case because NAJ's members have complied with the policy. They intend to comply with the policy. And so there is no prospect of an adverse action. Can I ask a question? I wanted to turn your attention to our unpublished opinion in Fleming v. Spencer. In that case, again, in an unpublished opinion, this court found that Chapter 23 requires administrative exhaustion, and that deals with the Thunder Basin issue under Chapter 23. So it is unpublished. It's non-precedential. But it seems to resolve the problem if we were to follow that case. So I think two things, Your Honor. First, it's unclear to what extent that suggestion is consistent with the first Thunder Basin factor, which asks whether a meaningful judicial review could be foreclosed by going through the statutory scheme. But I think, and this brings me to the other basis on which I think that that decision can be distinguished, which is that the personnel actions in that case were undoubtedly covered by the scheme. And they were also what the court described as minor. And so I think it's conceivable that Congress intended to channel constitutional claims to minor personnel actions through the OSC review process, queried again to what extent that's reconcilable with the Supreme Court's decision in Webster v. Doe and the first Thunder Basin factor. But this case ultimately is not that case because we're not talking about a covered action. And we're not talking about, even if it is covered, it's not minor. We're talking about a prior restraint. And the Supreme Court has said that a prior restraint is the most serious and least tolerable of infringements on First Amendment rights. Can I just ask you, you said earlier that this case is like free enterprise and that if this is covered by 23, there's no guarantee of judicial review. You might get it, but you might not. And that's what the court said in free enterprise was a problem. But it does strike me that there's some at least common sense appeal to the Fleming response to that, which is like, but you might get judicial review, so why don't you exhaust and see if you get judicial review? And if you don't, maybe now we have a Webster problem and come back to us then. So the Supreme Court has never held that an employee is, or a plaintiff rather, is required to exhaust their administrative remedies under a statutory scheme where that scheme doesn't offer a guarantee of judicial review. And if the question was simply whether the plaintiff administratively exhausted, that really would just effectively write the first factor of Thunder Basin out of the framework, because that question, the answer to that question would always be no, because a plaintiff could always come back to district court after exhausting, and the court has never approached the availability of meaningful judicial review in that way. I take your point that the court has never said that, but it's the court, the Supreme Court or this court in a published opinion never said the opposite. So I totally agree that if a statutory scheme basically guarantees ex ante that you will not get meaningful judicial review, you don't have to exhaust. But this is a situation where under this, it's almost like Schrodinger's effective judicial review, because any immigration judge who doesn't like this policy may or may not get effective judicial review, because if something sufficiently bad happens to them, they are going to get judicial review. But we don't know that, right? And so has the court ever said that in that situation, you don't have to exhaust? Has the Supreme Court or this court in a published opinion ever said in that, the Fleming situation, that you don't have to exhaust? No, it hasn't. But as I explained earlier, I do think the idea that a plaintiff just needs to administratively exhaust is inconsistent with free enterprise and the court's characterization of that case in Axon, because I think if administrative exhaustion would have been enough in that case, you know, the court would have said, well, just try anyway, wait out the board investigation, see if you get the kind of sanction that you can seek review of through the statutory scheme. And notably, the court didn't say that. It found that the scheme did not offer the plaintiff meaningful judicial review. Can I ask you to go back to something Judge Berner asked you, which is like the high level, how does this not just flip the statute on its head, which is to say that the person who gets the bad thing happen to them has to go through this administrative labyrinth, as you call it. The really bad things, if a really bad thing happens to you, you've got to go through the agency. But if either nothing has happened to you or only something minor has happened to you, you don't have to go through the agency. Instead, you can just go straight to federal district court, like taking a 10,000 foot overview, sort of like the court does in Axon. How does that not just like completely flip over the table on how this statute is supposed to work? So, I mean, I think that as if Hisoka recognized in Feds for Medical Freedom, the purpose of this history is to be comprehensive as to the claims that fall within its ambit. And that's claims that challenge a covered employment action. So it does nothing to serve that purpose to interpret the statute as stripping jurisdiction. But it doesn't really respond to this. But that doesn't really respond to the argument that the regime that would be created by adopting your rule seems wildly inconsistent with the sort of overall like music and lyrics, I guess music, not lyrics of this statute. Like it just doesn't seem to fit at all with what this statute is designed to do. Well, so I think two things. The first is, and I don't think this court needs to reach the hard question of whether constitutional claims challenging a minor personnel action of the kind that was at issue in Fleming is channeled or isn't channeled. I think that that's a harder question than the one that's presented in this case, where it is clear that what NAHA's members are challenging is not a, even if it is a personal action, it is certainly not a minor one. We're talking about a far-reaching policy that affects the speech of hundreds of federal employees. And I don't think, or I think rather that that is considerably more serious even than, you know, a suspension or termination of a single employee, because all of these judges are having their... But that now, that sounds like an argument that there's an exception for facial constitutional challenges. And the one thing Elgin tells me is there is no such exception. That just sounds like a facial challenge exceptionalism argument. Well, it's not an exceptionalism for facial constitutional challenges... Or a challenge to broad-based, if something is sufficiently broad-based. Fine, it sounds like an argument that if a policy is sufficiently broad-based, you can just get out of the statute. I mean, I think this ultimately comes down to what here and now injury means. And I think, you know, the court recognized in Axon Enterprise that that really is an exceptional thing that most plaintiffs are not going to be able to show. But NAHA is able to point to that kind of injury here, because we're talking about really the paradigmatic kind of irreparable harm in First Amendment. So can I just... One thing on, last on this. So there are, I believe, 96 federal district courts in the judicial districts in the country, I think. I'm not sure. Okay. So your argument, but just so I understand, there are hundreds of immigration judges. So under your argument, a single immigration judge could sue simultaneously in every single federal district court in the country challenging this policy, right? There's nothing that would stop them. Like I know you filed this in EDVA, but there's no reason you had to file this lawsuit in EDVA. You could have filed it any place that they have like jurisdiction. So instead of all being challenged through the agency, we could create a situation in which different federal employees simultaneously challenge the same nondisclosure policy in federal district courts across the country, and they're not channeled to the federal circuit. So they're going to be channeled to all the regional courts of appeals, right? So instead of going to the MSPB followed by going to the federal circuit, the legality of policies like this will be litigated around the country and go to every regional court of appeals, which again, at a high level of generality, seems wildly out of step with the entire point of the statute. The alternative is that these judges may never obtain judicial review through the statutory scheme. The special counsel has entirely unfettered discretion to decide whether to petition the board for corrective action or not. The solution to that is if the special counsel is totally unreasonable, you can seek mandamus against him. Now, you might say, I don't know where in the statute that comes from. Fair enough. But I mean, that would be a solution to that, right? If the only problem is you can't guarantee the special counsel will take it to the MSPB, a more targeted remedy would be to limit the special counsel's ability to not do that. I think that the first thunder basin factor which asks whether there will be meaningful judicial review, or rather whether going through the statutory scheme could foreclose meaningful judicial review, that's always been applied ex ante. It's always been assessed in terms of can obtain meaningful judicial review through the statutory scheme. And Axon makes clear that judicial review is not meaningful if you have to suffer irreparable harm while going through administrative proceedings to get it. And that's precisely what we have here. Can I just ask you a question about that last point and the here and now injury argument you're making? So Axon says that if your challenge is to the whole structure of the agency, it's like immunity. It really can't be rectified after the fact. And I'm trying to figure out is your argument about chilling effects, is it that it is a here and now injury of the sort contemplated in Axon because it's almost impossible after the fact to go back and remedy the period of time for which your speech was chilled? Or is it that it can never be rectified, period, because the whole point is you are not going to speak, there will not be an enforcement action, so there is no possibility. It's just sort of a logical impossibility. Those seem like slightly different things to me, but I may have not explained it well. I think it's the format. We can see that they could obtain prospective relief against the policy were they to ultimately end up in federal court through the statutory scheme, but it's that the federal circuit could never retrospectively remedy. Why not? Why couldn't you get damages? Well, we don't seek damages in this action. There is such a thing as damages for speech that has been chilled in the past, but maybe this particular statutory scheme doesn't make those available. Well, I think even this court has recognized that the kind of speech harm that we're talking about here isn't remediable even by damages. I mean, speech is just... We have cases about this saying, like, if you can show that your speech was chilled, you have a reasonable fear of repercussions in the past, and there's something specific you would have said, you can get damages for that. I think that this court's case law on applying the irreparable harm prong of the preliminary injunction test is instructive. This court has routinely found that the kind of harm you suffer at the hands of a prior restraint that really is, per se, irreparable harm, and the court has applied the Supreme Court's guidance in Elrod versus Burns. But that doesn't really work, because now you've just blown up your first amendment on exceptionalism theory, because we've also said that, basically, the deprivation of any constitutional right is, per se, irreparable harm. So if that's the response, then we no longer have a first amendment exceptionalism argument. We just have a constitutional rights are different argument, and that brings me back to Elgin saying constitutional rights are not categorically different. Well, I mean, I think what acts on us, and this is the language the court uses, is whether it's the kind of harm that can be undone. And the harm that judges suffer in terms of judges not being able to engage in private capacity speech now on matters of urgent concern, because the policy forbids them from doing that. Judges who seek, continue to seek pre-approval, but only to speak in their official capacities, meaning that the agency has a veto over what they can and cannot say. Judges who face delays, or sometimes do not get a decision at all when they do seek pre-approval from the agency, none of that can be undone by post deprivation federal circuit review. There are judges right now who want to be able to speak at events and are being precluded from doing so, and the federal circuit, if judges ever get there down the road under the statutory scheme, and I think it's extremely unlikely, would not be able to enable those judges to speak at these events. Why is it unlikely that they would get there under the statutory scheme? I actually think it's highly likely that the OSC would bring the case because there's an allegation of a constitutional harm. I think it's unlikely that the OSC would decline to take it, and they would take it to the MSPB, and then it would be appealable to the federal circuit. So it seems it is likely. And following just on Judge Hyten's hypothetical of 96 cases going to different federal district courts, I would venture to guess that many, many agencies have a speech policy that limits the speech of the employees at the agency and requires them to go through some kind of review prior to public speaking. And so it's not only that there could be 90 some odd cases challenging the same policy, there could be cases challenging every policy of any federal agency brought to federal court rather than to the agency that the single agency, so you could have rather than a patchwork of policies around the country, a single policy governing all of the employees of that agency. So to your honors, first question about the likelihood of getting judicial review through the OSC process. To start, and this goes back to the language of the first Thunder Basin factor, it's whether going through the scheme could foreclose it, not whether it definitely would. But more than that, the special counsels, and I think this is instructive, reports from the last five fiscal years show that it has never once petitioned the board for corrective action. That has never once happened in the last five years. And that's strongly suggestive that going through the OSC process is unlikely to result in judicial review. But to your honors' second concern, I mean, I think if federal agencies, if there are numerous federal agencies with a kind of equivalent gag order we're talking about in this case, which are prohibiting broad swathes of federal employees from engaging in First Amendment protected speech on matters of urgent public concern, those employees are entitled to immediate judicial review. This is a very serious infringement of First Amendment rights that we're talking about. And we have kept you way too long. Thank you very much for your patience. Thank you so much. Good morning, your honors. Jennifer Utrecht on behalf of the government. Your honor, the CSRA is an exclusive and comprehensive regime that precludes district court jurisdiction for all covered personnel claims that fall within the scope of the statute. At bottom, plaintiff's argument here is that their claim is different and it falls outside this exclusive regime either on one of two theories. One is that there is somehow an exception for preemptive challenges to policies that will impose discipline. And the other is that there is somehow an exception for First Amendment challenges. Neither of those sort of carve outs are supported by either the text of the statute. And in fact, they're contrary to the Supreme Court's decision in Elgin and would flip the actual operation of the statute on its head in a number of ways. So first, as Elgin recognizes, the CSRA was designed so that there would be a uniform body of federal law that would govern personnel actions involving discipline, involving the changes in responsibilities, duties, and working conditions that violate the Constitution. If plaintiffs were correct that they could bring district court cases before any discipline had been initiated, that would completely dissolve this ability to have a uniform body of case law. There would be district court cases throughout the country addressing the constitutionality of the same federal policy governing the same federal employees. It would completely overturn the uniformity that Congress intended through the CSRA. The second way that plaintiff's proposal would flip the statutory scheme on its head is that it would create a system where individuals who are, in some respects, the least injured, who had not had any discipline imposed on them at all, would be able to proceed in district court, whereas those who had, in fact, been terminated or suspended or had a reduction in pay would have to go through the administrative steps. That's precisely contrary to the way that Congress intended the statute to operate. It also creates parallel, potential parallel jurisdiction problems. I know that plaintiffs here have asserted in their complaint that they do not intend to violate the statute and that is the reason that they, or the policy, and that is the reason they believe they can proceed in district court. But the fact of the matter is, if someone were to violate the policy, would they then be able to proceed both in the MSPB and in the district court? I mean, these are the sorts of concerns that Elgin articulated as to why constitutional challenges, no less than other types of challenges, have to be channeled through the CSRA's regime. Can I ask you a threshold question that's been bothering me since I started looking at this case and all these cases? What is the underlying waiver of sovereign immunity here? I'm sorry. This is a lawsuit against the federal government. So I start with the premise you can't see the, like, so the Thunder Basin even says, like, it's whether it withdraws 1331 jurisdiction, but then it's like this is a suit against the United States. So therefore I 1331 is not a waiver of sovereign immunity. So what's the waiver of sovereign immunity here? So we haven't, I mean, it's possible that sovereign immunity would be a separate jurisdictional problem. We haven't really addressed that here, in part, because the district court held that the CSRA preclusion is a divested of subject matter jurisdiction. I mean, it's, it is clear that Congress, through the CSRA, articulated a specific scheme whereby federal employees are challenged. Sure. I'm just saying, like, in general, if a person wants to go into federal court and sue the federal government, they need a waiver of sovereign immunity. Although I guess technically, is it, maybe this is just ex parte young. The federal government is not the name defendant in this lawsuit. So this is effectively an ex parte young action. Certainly not something we'd briefed, and I wouldn't want to get out ahead of the government's position on this issue. I would say that I think this is a common question in, sort of, these implied First Amendment actions. So can I just, like, at a high level of generality, like, my hypothesis is that people who drafted this law were simply not thinking about constitutional challenges. It seems fairly clear to me that they weren't. So let me just ask you, so let's put aside the employee who doesn't violate the policy. Let's talk about the employee who gets what I'll call low-level discipline. Let's talk about, so not fired, the low-level discipline person. So let's say a person violates this statute and gets low-level discipline, and they say that low-level discipline violates the First Amendment. Okay? Let's just posit all that. Say that I believe that constitutionally speaking, that person has to have a mechanism to get to federal court. A person who claims that their federal employer violated their First Amendment rights and did a bad thing to them as a result of that has to be able to get to federal court. The problem, I say, is that the straightforward reading of the statute is there is no way to guarantee they can get to federal court. So I can do one of two things in response to that. One, I can basically force the special counsel to do the thing that will let them get to federal court, the sort of mandamus approach. Or I can let them go straight to district court. But that constitutionally, they have to be able to do one of those two things. Does the government have a position of which of those two things it should be? I'm sorry. The order was, the first one was that they have to force the special counsel. Well, so it's the thing that Judge Brinkema basically says. Judge Brinkema responds to this by saying you could effectively, in that situation, a court could, in an extreme situation, force the special counsel to commence a series of events that would culminate in them being able to go to the federal circuit. I don't really know how the statute says you can do that, but I think it's against a backdrop of there simply cannot be the case. Congress is not allowed to say that a federal employee who says that something bad happened to them in violation of the First Amendment has no mechanism of getting to federal court. And so how would you go about doing that? So I would say that we would look at the CSRA, which, as Your Honor's question notes, provides administrative options for that claim to be raised that would get judicial review. There's this hammerlock where the special counsel can stop me from going to federal court. So as to that point, Your Honor, so I understand that the premise of the question is that you have concerns with that. But I mean, this court's decision in Pinar v. Dole, the logic of Elgin, the D.C. Circuit's decisions in AFGE v. Trump and Secretary of the Air Force, the Sixth Circuit's decision in Crastor, they all reflect a basic principle, which is that Congress can decide that there are certain low-level things for which there are administrative protections, but no possibility of judicial review. And I certainly, let me just posit, outside the realm of constitutional rights, I think that absolutely makes perfect sense. Congress can, if I, you know, if I put a reprimand in someone's file for, like, doing something bad, I think it's, and assuming that there's no allegation that that violates the Constitution, it's just the person thinks it was really, really wrong or really, really arbitrary or really, really unreasonable or really, really unfair. I agree. There is no constitutional problem whatsoever with saying that person has no way of getting to court. But I'm saying when it comes to the allegation that the federal government violated my constitutional rights, that is different, and you cannot say that person can't go to court. And as to that point, Your Honor, if that's your concern, then I think that the alternative exhaustion problems are a way to handle this case, that plaintiffs have not attempted to go through the Special Counsel, that we don't know how the Special Counsel would handle that. And the Special Counsel, whose very job it is to investigate these personal practices, who operates independently, and is supposed to correct these things, has every incentive to both work with the agency to correct potential constitutional problems, even before an MSPB complaint is filed, and to file MSPB complaints. And if it comes to pass that neither of those things happen, and there continues to be a constitutional problem, then perhaps we can address the Judge Brinkema question of whether sort of a mandamus action might be appropriate in that instance. We're not presented with that here because there has never been an invocation of those procedures by these plaintiffs. Could you give me an example of what you think the agency's threshold expertise is here? You say in the brief that the agency has threshold expertise. As applied to this specific policy, what is a tangible example of where you think the agency would have expertise? Sure. So there's three things I think I'd like to point out here. The first is, as Elgin recognizes, the MSPB routinely deals with claims of personal violations. No, no, I don't want high-level generalities. I want a specific example of what you think the agency is. Thanks very much. General point, it routinely deals with these things, which means that it routinely deals with, as would be relevant to this policy, both developing a factual record in terms of how the agency is actually applying the policy. And if you look at the plaintiff's complaint, there are some allegations about how the policy is being applied that on the face of the policy don't seem to be actually what the agency is required to do. There would be factual disputes about that. There would be development of what need for the policy is, how common this is, which can reflect on how important it is for the government to have this sort of restriction. All of these sort of threshold factual questions go directly to the Pickering balancing test that would apply with respect to the ultimate constitutional question here. And those are the sorts of things that the MSPB deals with all of the time. And it's- I guess including what was the perceived need for this policy, because potentially, I guess the agency could say, before we had this policy, we had employees who were going off and doing things that were, ostensibly speaking, in their personal capacity, but sure seem to be speaking in their government capacity and sure seem to be saying things, like stuff like that, like why we adopted this policy in the first place. Exactly. And I also note, Your Honor, I mean, part of the congressional delegation of authority to OSC is before an MSPB complaint is filed to work with the agency after it's investigated, you know, to try to correct the problem before a complaint is filed. That's part of the special counsel's job. And so there is an expertise there as well. It's both investigating the complaint, working with the agency, proposing solutions. These are the sorts of things that as a practical matter happen before an MSPB complaint is filed and certainly before judicial, you know, review would come into play before the courts have to- are asked to weigh in on this. So can I talk about NTEU briefly? So it's the government's view there wasn't actually jurisdiction in that case. It's just that no one somehow managed to notice that there was ever jurisdiction in that case at all? No one picked up on the fact that there was no jurisdiction in that case? As is the case, I think, in many older Supreme Court cases, jurisdiction was not addressed by the court at all. And- So the answer to my question is yes. I would have to do a deep dive into the how that the procedural history of that case, but my- No, I don't mean how it happened. Yeah. The government's view is there was, in fact, no jurisdiction in NTEU. I think that's the right answer based on what the Supreme Court has said in Elgin and what this court and other courts of appeals have said about CSRA channeling since the Supreme Court's decision in Elgin. Can I ask you just a question about how much it matters for your argument that this is a covered action under Chapter 23? Because I understand your argument to be first, we think it's covered, but second, it really doesn't make any difference because if Congress doesn't want to cover it under 23, that's fine, and they're just channeling it to post-enforcement review under Chapter 75. So does it matter to your argument whether it's covered? So it matters in the following way. So your Honor is correct that our bottom line position is that if Congress has directed that something be channeled through post-enforcement review and there's judicial review at the end of that, that's sufficient. Elgin makes clear that's sufficient. Where Chapter 23 comes into play, it matters in two respects. The first is that it shows that Congress did contemplate some sorts of limited pre-enforcement challenges. This isn't something that is, you know, an anomaly. We know that Congress thought about this. It prescribed the limited ways that this could happen, which means that this isn't an oversight and if plaintiff's claims fall outside of this limited review, that is the scheme that Congress designed and courts have to give effect to that. The second way that it comes into play, your Honor, is that Chapter 23 also provides clear statutory exceptions to the OSC process. One for employment discrimination that's prohibited by other statutes. You know, if those statutes provide direct review to the MSPB, Chapter 23 permits that. And the second is for situations where an employee claims that they were retaliated against for whistleblowing or for refusing to comply with an order that would require the employee to violate a law. And those also, the employee, can file directly with the MSPB. And what that shows is that Congress knows how to create exceptions. It did not create an exception for the type of claim that plaintiffs want to bring here that would allow them to bypass the special counsel process. All that shows really goes to the comprehensiveness of the CSRA. It reinforces the point that district court jurisdiction is precluded over this type of claim. So you have like maybe an even stronger argument if this is a covered practice or covered thing under Chapter 23. But I do understand like almost the main point in your brief to be, well, who cares? Because even if it's not covered under 23, Congress can channel it into post-enforcement review under Chapter 75. And I guess I'm totally understanding that except with respect to this particular injury. Because I do get caught up in this question. Even if Congress can mostly do that, how can it do that if by definition we're talking about a cognizable constitutional injury? The court has said this a million times. Like chilling effect, that counts. That's a First Amendment violation. But it is one that by definition cannot be reviewed post-enforcement because there will be no enforcement because the speech is chilled. Then it seems like you are just saying, I guess this goes back to Judge Heiden's kind of first premise. Like and in those cases there will simply be, you can have a broad speech restriction. No federal employee may ever criticize the president in public. And it simply will not be subject to judicial review. And that strikes me as like kind of a non-starter. Well, I'll say that, Your Honor. I would note that although plaintiffs have sort of characterized their claim as being divorced from the sorts of things that are covered under Chapter 73, if you look at the allegations, they really are inextricably intertwined with the kinds of discipline that would be covered by Chapter 23. The basis for their standing. I totally understand your argument that it is covered by 23. Oh, sorry, 75. I'm sorry. I meant to say 75. Because if you look at the allegations of their complaint, the basis for their standing, this theory that their speech is being objectively chilled is because of the threat. As they note in the complaint, I think in the first paragraph of the complaint. That's just First Amendment doctrine. There's a law out there. It says if anybody in the world criticizes the president, they'll go to jail. Like I point at the law. I say that's what's chilling my speech. But I'm not going to do it because I don't want to go to jail. And in most contexts. Right. The Supreme Court said a million times, fine. We'll review it on its face, pre-enforcement. So two more points. One, again, with respect to the to tell the agency that they can't impose the discipline. That's what I would be saying. Just imagine a statute. It's a criminal statute that says you can't talk about, nobody can talk about immigration policy in public. From now on, we're just not having that as part of the public dialogue. I could, as of today, go to court and say that thing is chilling my speech. I want to speak about immigration policy. Now I can't. And nobody would think, well, that's weird that you can get review of it before it's enforced against you. That's just First Amendment doctrine. So I don't mean to be frustrating here, but I think the core distinction here is that I don't think we would be in this courtroom today if there was a policy by EOIR that said it would be really nice if you asked for supervisory approval, but it's not required and there's no enforcement action against you. Well, then there's no chill. Right. Right. Well, so what I mean to say, Your Honor, is that the theory of injury, the chill, is directly related to the sorts of things that are covered by Chapter 75. They are trying to jump the process. And the other point, Your Honor, and I understand there is this concern that emanates throughout First Amendment case law. It would be very difficult to create this carve out without calling into question all sorts of ethics policies which could in some way be characterized as being about speech. There are, as Your Honor, as our brief notes, Department of Justice employees broadly, as EOIR immigration judges are, are subject to a whole host of ethics regulations that govern financial disclosures, that govern prohibited sources of payment, those sorts of things. Take Roman at 11, which is literally about non-disclosure policies, every single one of which implicates speech. And that is something that Congress said has to be channeled through the special counsel. That was a friendly question. So, you know, these, these sorts of concerns echo throughout government policies. Congress intended for these sorts of concerns to be raised either in post-enforcement proceedings or through the special counsel process. And the fact that these sorts of concerns were contemplated, that Congress created procedures that lead to judicial review, shows that there is no jurisdiction in district court over these kinds of challenges. And I, I appreciate the concern that the plaintiffs have expressed that there, in a hypothetical world, may be some way in which they go through the process and don't end up in a federal court. We're not there. We haven't even initiated those steps. If it's covered by 23. If it's covered by 23, you think, then we don't. And, and also, I also want to be very clear. I mean, the question of whether it's covered by Chapter 23 really is a question for the special counsel. That is the kind of thing special counsel addresses when it makes determinations about whether to investigate and file a claim. And if plaintiffs, the premise of plaintiff's argument is that individuals can sue in district court claiming that something actually isn't covered by 23 before they go to the special counsel. We are going to have this problem of 90, I think, I believe the, the number was above 90 district courts weighing in on what counts as a significant change in duties, responsibilities, and working conditions that may have differing views from the special counsel, the MSPB, and the federal circuit on that. That's the sort of thing that Congress wanted to avoid when it created the CSRA. If there are no further questions, we would ask that you affirm. Thank you very much. Your Honor, it's just a few quick points in, in rebuttal. Judge Hyden's on your question of sovereign immunity waiver. I think the answer is ex parte young because we seek only injunctive relief or an alleged constitutional violation. On the government's argument of, of, of, of, of,  suggestion that the scheme provides a meaningful judicial review, even if immigration judges have to violate the policy in, in order to get it. I think that's directly inconsistent with the Supreme Court's decision in free enterprise, which says that you don't have to vet the farm to get judicial review, and that if you do, that's not a meaningful avenue for relief. And the implications of that argument are startling. A current, the current administration or a future one could issue a regulation requiring all federal employees to declare their, their loyalty or to abstain from all criticism of the administration and its allies. And employees would only be able to seek judicial review by risking termination and violating that regulation. And I don't think that's the law. The government's more aggressive argument that if the statute does not provide for judicial review, that's simply a deliberate congressional choice. I think that's directly inconsistent with the Supreme Court's decisions in Thunder Basin and Elgin, which recognized that a serious constitutional question would arise if a statutory scheme were interpreted to foreclose all judicial review. And that's precisely why the Supreme Court... Foreclose all judicial review of what you would agree for non-constitutional claims. There's no problem with that, right? That's correct. Okay. Yeah. It's a serious constitutional problem to foreclose all judicial review of non-frivolous constitutional claims. That's... That's right. And on this question of whether you can get administrative exhaustion at the end, I mean, notably the government in its briefing at least suggested that NAJ's members and federal employees generally would not be able to raise their claims to district court, even if they were unable to get a judicial review of a colorable constitutional claim through the statutory scheme. But I also just think that this idea that administrative exhaustion is sufficient is at odds with Thunder Basin itself. You would have expected the court in that case to say that a plaintiff could simply come back to district court if they were unable to get judicial review through the statutory scheme. So I hear you on this and on the whole, I guess really the district court's holding and Fleming, and I understand sort of the conceptual issues you're raising, but I guess I'm thinking about almost more as a constitutional avoidance kind of thing. I do understand your point about the serious constitutional questions that would be raised if we adopted at least part of the government's position, which is, well, maybe you will never get judicial review and that's okay. That was Congress's choice. But we don't know that we have that constitutional question in front of us because it is quite possible, as Judge Berner kind of outlined, that if you raise this, special counsel will bring it to the board and then it will go to the federal circuit. And so it feels somehow just as a question of kind of constitutional avoidance, somewhat premature to weigh in on what would happen in that scenario. Could I have 30 seconds to answer your question? I think that, you know, Thunder Basin and Webster, well, Thunder Basin and Elgin are clear that the constitutional question arises if, by forcing a plaintiff to go through a statutory scheme, that could foreclose judicial review. And that's precisely why the court in Thunder Basin framed the first factor as it did, with the emphasis on could and not would. Do you have a question? All right. Thank you very much. We will come down and greet counsel. And then we're going to, I will ask after we greet counsel to, we'll do a short recess. This honorable court will take a brief recess.
judges: Pamela A. Harris, Toby J. Heytens, Nicole G. Berner